# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

REGGIE HUFF, et al.,     )  CASE NO.  5:12CV2583
            )
      PLAINTIFFS, )  JUDGE SARA LIOI
            )
vs.           )
            )  MEMORANDUM OPINION
            )
            )
FIRSTENERGY CORP., et al.,   )
            )
      DEFENDANTS. )

On October 16, 2012, plaintiffs, Reggie Huff and Lisa Huff, filed a *pro se* complaint in this Court alleging: violations of the federal Racketeer Influenced and Corrupt Organizations Act ("federal RICO"), 18 U.S.C. §§ 1962(b), (c), and (d); violations of Ohio's "corrupt activity" law ("Ohio RICO"), Ohio Rev. Code § 2923.32;[1] conspiracy under federal and Ohio law; and violations of their civil rights under 42 U.S.C. § 1983 (Doc. No. 1, Complaint). Plaintiffs originally named eleven defendants (not counting John Doe defendants), including corporate entities, private individuals, and current and former Ohio Supreme Court justices. The complaint further alleged a vast conspiracy to deprive plaintiffs of their right to a fair disposition of a personal injury action in state court.

The allegations in the 43-page complaint are confusing, rambling, and, at times, inflammatory. Although much thought and attention appears to have gone into its

---

[1] Ohio Rev. Code § 2923.34 provides individuals with a civil cause of action for violations of § 2923.32, which is otherwise a criminal statute.

preparation, the complaint is ultimately held together by a string of conclusory allegations.[2] These allegations were immediately met with a motion to dismiss (Doc. No. 7), which is the subject of this Memorandum Opinion The motion is fully briefed and ripe for resolution (Doc. Nos. 12, 15, opposition brief and reply, respectively).

## I.        BACKGROUND

### A.        The Underlying State Court Action

The facts and circumstances of this RICO-based fraud case can be traced to a personal injury proceeding originating in the court of common pleas sitting in Trumbull County, Ohio.[3] In June 2004, plaintiff Lisa Huff was injured by a falling tree limb near utility lines owned and maintained by defendant Ohio Edison. According to the complaint, the tree in question was located on property that was covered by an easement owned by Ohio Edison. (Compl. ¶ 35.)

Plaintiffs filed suit against Ohio Edison, defendant FirstEnergy Corporation, and Asplundh Tree Expert Company, the company hired to inspect and maintain trees and vegetation along Ohio Edison's power lines. The state trial court granted summary judgment to the defendants, finding that they owed no duty to Lisa Huff. With respect to Ohio Edison, the trial court found that it did not have actual or constructive notice of any defects in the tree or that it posed any threat of injury. *Huff v.*

---

[2] What the complaint lacks in factual support, however, it makes up for in numerous legal citations, stray social commentary on corruption in our society, and attacks upon the federal and state justice systems.

[3] The history of that litigation is set forth in *Huff v. FirstEnergy Corp.*, 130 Ohio St. 3d 196 (2011), which is frequently referenced in plaintiffs' complaint and is therefore properly before this Court. *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 555 (6th Cir.), *cert. denied*, 133 S. Ct. 1239 (2013). Moreover, the Court may take judicial notice of proceedings in other courts. *See Buck v. Thomas M. Cooley Law School*, 597 F.3d 812, 816 (6th Cir. 2010). However, because plaintiffs contest some of the factual findings made by the Ohio Supreme Court (and its ultimate ruling), which, plaintiffs believe, were fueled by bribery, the Court will confine its consideration of the relevant facts to those set forth in plaintiffs' complaint, and will view those factual allegations in a light most favorable to plaintiffs.

*FirstEnergy Corp.*, 130 St. 3d 196, 199 (2011). The state court of appeals reversed, finding that there was a question of fact as to whether Lisa Huff had enforceable rights under the contract between Ohio Edison Company and Asplundh as a third-party beneficiary. *Id*.

The Ohio Supreme Court first denied discretionary review. On reconsideration, it granted jurisdiction, and reversed the court of appeals, finding that the underlying tree and vegetation maintenance contract did not create any duty to Lisa Huff. *Id*. In reaching this conclusion, the court emphasized that "[t]he contract was not entered into for the general benefit of the public walking on public roads. It was designed to support the electrical service offered by Ohio Edison." *Id*. at 201.

###### B.     *Federal Racketeering and Conspiracy*

On October 16 2012, plaintiffs[4] filed suit in this Court against various private and public entities and individuals. The private entities and individuals included: FirstEnergy Corp., Ohio Edison, FirstEnergy PAC FSL, Leila Vespoli, Anthony Alexander, and James Pearson (hereinafter "FirstEnergy defendants"). It is alleged that defendant Vespoli is General Counsel for FirstEnergy Corp., Ohio Edison, FirstEnergy PAC FSL and Senior Executive VP for FirstEnergy Corp. (Compl. ¶ 30.) The complaint further provides that defendant Alexander is President and Chief Executive Officer of FirstEnergy Corp., and defendant Pearson serves as Treasurer for FirstEnergy PAC FSL. (*Id*. ¶¶ 31-32.) The public individuals, whom plaintiffs described as "nominal defendants," include former Justice Robert Cupp, former Justice Lundgerg-Straton,

---

[4] Plaintiff Reggie Huff is Lisa Huff's husband. (Compl. ¶ 26.)

3

Justice Terrance O'Donnell, Justice Judith Lanzinger, and Chief Justice Maureen O'Conner (hereinafter "judicial defendants"). In an opinion and order dated February 20, 2013, the Court dismissed the judicial defendants from this action on the basis of judicial immunity. (Doc. No. 18.)[5]

Plaintiffs have alleged a conspiracy between judicial defendants and FirstEnergy defendants to influence litigation involving FirstEnergy defendants. In the complaint, plaintiffs aver:

> Plaintiffs, as life long registered **Republicans**, are suing the Defendants for using large campaign cash payments . . . , including an illegal **"STRAW DONOR"** scheme (See U.S. v. O'DONNELL 608 F.3d 546 (9th cir. June 14 2010)), paid to a super majority of **Republican Justices of the Ohio Supreme Court** in order to launder **bribes** in the form of "stream of benefits" with the specific intent to retain the Ohio Supreme Court Justice's services for specific favorable action on a "as needed" basis[.]

(Compl. ¶ 12.)[6]

## 1.    "Straw Donor" Scheme

According to the complaint, FirstEnergy defendants relied on bribes and a "straw donor" scheme to ensure that the judicial defendants would ultimately rule in Ohio Edison's favor in Lisa Huff's personal injury action. The straw donor scheme was allegedly executed by Vespoli and Alexander, who would (along with their spouses) make individual donations to the judicial defendants in an apparent effort to circumvent

---

[5] In that same opinion, the Court dismissed plaintiff Lisa Huff, finding that she had failed to sign the complaint. In an opinion and order dated July 15, 2013, the Court reinstated Lisa Huff as a party plaintiff. (Doc. No. 27.)

[6] Unless otherwise noted, all complaint quotes have been reproduced with bolding, underlying, and typographical errors as they appear in the original document.

the monetary limits placed on corporate campaign contributions. (*Id.* ¶¶ 38-39.)

Specifically, the complaint provides that:

> In the weeks that preceded the foreseeable tree incident on **June 14th 2004,** which was well publicized, . . . **LELIA L. VESPOLI & ANTHONY J**. **ALEXANDER** became aware of the case and concerned that the unique facts might be problematic for **FIRSTENERGY & OHIO EDISON COMPANY'S** interests. Defendants **VESPOLI & ALEXANDER, (Also referred to from time to time as the Executive Defendants)** being both intelligent and experienced Ohio Attorneys, anticipated that the lawsuit could be pushed all the way to the Ohio Supreme Court. Defendants **VESPOLI & ALEXANDER**, and others yet to be identified employees and/or individuals, recognized a need to have the Ohio Supreme Court destroy the suit no matter what path it took in getting to that Court. Plaintiffs allege that their lawsuit was not the only future legal issue that the [FirstEnergy defendants] were hoping to influence at the Ohio Supreme Court nor is the initial motivation ultimately relevant to this cause.
>
> The Executive Defendants were fully aware of the effectiveness and value of lobbying the executive and legislative branches of government and the value of large campaign cash contributions in gaining and increasing lobbying access to public officials while in power. The Executive Defendants were extremely well compensated from Defendant **FIRSTENERGY**, in part, for finding and executing ways to enhance its influence footprint. At that time Defendants **VESPOLI & ALEXANDER**, became frustrated that the judiciary was the one branch of the government that they could not legally lobby and that campaign contribution limits were comparatively low which reduced their ability to stand out on the [judicial defendants] donor lists which typically put largest donors at the top of the list. Due to this unacceptable limitation on influence Defendants **VESPOLI & ALEXANDER** devised a scheme and artifice to thwart the very purpose for the unique contribution limits for judicial candidates through a **straw donor scheme** in violation of **Ohio Revised Code 3517.13(G)(2)(a) & 3517.13(G)(1).**

(Compl. ¶¶ 37-38.)

Plaintiffs aver that the "so-called personal contributions" of Vespoli, Alexander, and their spouses "align[ed] perfectly" with FirstEnergy PAC FSL contributions, and suggest that unidentified evidence "supports allegations that spouses

likely did not write separate checks or transfer funds in their own names independently, which is legal only as a segregated act from the overall pattern of unlawful conduct." (Compl. ¶ 39(A) and (D).) According to plaintiffs, "[t]his fact supports the conclusion that contributions were not the product of an independent family decision and did not involve actual losses to the spouse as they were to be reimbursed or had already been remunerated by **FIRSTENERGY**." (*Id.* ¶ 39(D).) Plaintiffs conclude that the "**straw donor** scheme is a linchpin anchoring the motives and machinations of a true scheme to defraud the public, the State of Ohio, the United States and the Plaintiffs of honest services by and through the bribery of public officials, namely a super majority of the Ohio Supreme Court Justices." (*Id.* ¶ 41.)

2.    *Bribery Scheme*

With respect to the related bribery scheme, the complaint provides:

> This case involves the allegation of a ***quid pro quo*** between the [FirstEnergy] Defendants . . . and five Republican Justices of the Ohio Supreme Court . . . that may have been implicit in the beginning but nonetheless became **explicit** and **specific** under extreme pressure of the exigent need for a string of specific unimaginable favorable and improper official acts. An express about face from the established proper course of a case for the unique and exclusive benefit of large cash donors upon illegal campaign cash influence and ***ex parte*** prodding (**See statement attributed to Attorney David J. Betras on pages 30-32**) formed an agreement to accept past, present and future cash payments as a **$150,000 + bribe** and payoff for the set of unique, special, specific AND improper official acts needed to prevail in a major civil suit [the Huff personal injury action].[7]

(Compl. ¶ 13).

---

[7] Plaintiffs allege in their complaint that the underlying personal injury action was potentially worth "TENS to the HUNDREDS of MILLIONS of DOLLARS . . . ." (Compl. ¶ 43.)

Plaintiffs surmise, without support, that after the court of appeals reversed the state trial court's judgment in the personal injury action, FirstEnergy defendants "**maxed out collective direct cash payments**" to the judicial defendants in an effort to secure a favorable ruling in the Ohio Supreme Court. (Compl. ¶ 43.) The complaint goes on to provide, in conclusory fashion:

> **On August 25th 2010 the Ohio Supreme Court, undoubtedly fully aware of the legal problems, properly <u>DENIED</u> the . . . appeal.** Only two (2) of the Republican Justices targeted for influence got the message and voted to violate the Court's mandate in favor of the [FirstEnergy defendants], that being Justices **Cupp** and **Lundberg Stratton**. **This event represented the first time that any case highlighting FIRSTENERGY as a major party of interest was lost before the Ohio Supreme Court**. This event was beyond unacceptable to the [FirstEnergy defendants]. Evidence supports the fact that the [FirstEnergy defendants] became incensed that all their cash payments had not created a special enough status (acted as a bribe) entitling them to an automatic review by the [judicial defendants] they put in power even when a mere review was not adequate.
>
> The preponderance of evidence supports a finding by the trier of fact that after their appeal was properly <u>DENIED</u> the [FirstEnergy defendants] were unable to resist the exigent need to utilize their bought and paid for political influence to gain access to the Republican Justices, *ex parte*, and communicate explicitly and/or implicitly the unacceptable nature of their failure to perform their end of the *quid pro quo*.

(Compl. ¶¶ 45, 46.) According to the complaint, the judicial defendants' "end of the *quid pro quo*" arrangement was to commit an "<u>unprecedented reversal of the already established proper course </u>of the case to an improper course which simply never happens naturally or organically." (*Id.* ¶ 47.) In addition to the Ohio Supreme Court's decision, on reconsideration, to grant discretionary review, the complaint cites to the "principle of law known as *stare decisis*[,]" unidentified statements made by third-parties to the Ohio Supreme Court[,] the fact that plaintiffs' former counsel was purportedly "literally

7

stunned by the conduct of the Ohio Supreme Court," and the Ohio Supreme Court's discussion of "*de novo*" review in an unrelated case to support the alleged bribery scheme. (*Id.*)

## II.      STANDARD OF REVIEW

FirstEnergy defendants bring the present motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, maintaining that the complaint fails to state a cause of action. To satisfy the pleading requirements of Rule 8, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In reviewing a complaint in the context of a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

A complaint need not set down in detail all the particulars of a plaintiff's claim. However, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (This standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555); *see Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000) (the court should not accept conclusions of law or unwarranted inferences couched in the form of factual allegations). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc*., 859 F.2d 434, 436 (6th Cir. 1988) (emphasis in original)

*abrogated on other grounds*, *Buckhannon Bd. & Care Home, Inc. v. Va. Dep't of Health and Human Resources*, 532 U.S. 598 (2001)).

Because plaintiffs' RICO claims require proof of mail or wire fraud as an element, the plaintiffs must also satisfy the heightened particularity requirements of Federal Rule of Civil Procedure 9(b) with respect to the elements of fraud. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 688 F.3d 393, 403 (6th Cir. 2012). "Rule 9(b) states that 'in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Id*. (quoting Fed. R. Civ. P. 9(b). This includes alleging the "time, place, and content" of the alleged fraudulent acts; the existence of "the fraudulent scheme," the "intent" of the participants in the scheme, and "the injury resulting from the fraud." *Heinrich*, 688 F.3d at 403 (internal quote and cite omitted). *See Bender v. Southland Corp*., 749 F.2d 1205, 1216 (6th Cir. 1984) (upholding the district court's dismissal of RICO claims where the complaint failed to allege adequate particularity).[8]

In considering the motion to dismiss, the Court is mindful that *pro se* complaints must be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Nonetheless, "pro se plaintiffs are not automatically entitled to take every case to trial." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). "As [the Sixth Circuit] has noted, the lenient treatment generally accorded to pro se litigants has limits."

---

[8] In *Chesbrough v. VPA, P.C.,* 655 F.3d 461, 466 (6th Cir. 2011), the Sixth Circuit observed that the heightened pleading standard served "to prevent fishing expeditions, to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters." (internal quotations and citations omitted).

*Id.* (citing *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991)). For example, where "a complaint consist[s] of nothing more than naked assertions, and set[s] forth no facts upon which a court could find a violation of the Civil Rights Acts, [it] fails to state a claim under Rule 12(b)(6)." *Yusuf v. Vasser College*, 35 F.3d 709, 713 (2d Cir. 1994) (internal quotation and citation omitted); *see Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989) (the court is not required to "guess as to the nature of the claims asserted"), *abrogated on other grounds*, *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc). Indeed, courts have been unwilling to "abrogate basic pleading essentials in *pro se* suits." *Wells*, 891 F.2d at 594.

### III.     LAW AND DISCUSSION

#### A.     *Plaintiffs' Motion to Strike*

As a preliminary matter, the Court must address plaintiffs' motion to strike (Doc. No. 10). FirstEnergy defendants oppose the motion (Doc. No. 14), and plaintiffs have filed a reply (Doc. No. 16). By their motion, plaintiffs seek to strike defendants' entire Rule 12(b)(6) motion on the grounds that it relies upon matters that are beyond the pleadings. Specifically, plaintiffs complain that defendants have cited "extrinsic, false and out of context matters namely the idea that Plaintiffs have been sanctioned for 'frivolous' litigation." (Doc. No. 10-1 at 3, Page ID # 245.) While plaintiffs insist that these prior sanctions were "directed at obstructing justice for the benefit of well funded racketeers that had arranged to have litigation fixed rather than face severe punishment as commanded in Law[,]" plaintiffs argue that this extrinsic evidence is "immaterial," and can only serve to distract the Court and prejudice plaintiffs. (*Id.*)

Plaintiffs also take issue with the fact that defendants represented in their dispositive motion that the state appellate court affirmed a finding that Ohio Edison "owed no traditional tort duty to Ms. Huff." (Doc. No. 10-1 at 3, Page ID # 245 [quoting Doc. No. 7-1 at 3, Page ID # 154].) Plaintiffs insist that this statement is false, arguing that the appellate court did not conduct a *de novo* review, but, instead, sustained all of Lisa Huff's assignments of error. According to plaintiffs, this is a key issue in the present litigation.

FirstEnergy defendants argue that "'[a] motion to dismiss is not actually a 'pleading' from which matter could be struck.'" (Doc. No. 14 at 1. Page ID # 313 [quoting *Clark v. Walt Disney Co.*, No. 2:08-cv-982, 2009 WL 1026451, at *1 (S.D. Ohio Apr. 15, 2009) (further citations omitted)].) This Court agrees. Under Rule 12(f) of the Federal Rules of Civil Procedure, "a court may strike only material that is contained in the pleadings." *Fox v. Mich. State Police Dept.*, 173 F. App'x 372, 375 (6th Cir. 2006). Because Fed. R. Civ. P. 7(a) confines its definition of pleadings to "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer[,]" a motion to dismiss cannot be considered a pleading within the meaning of Rule 7(a).[9] *See also Fox*, 173 F. App'x at 375 ("Exhibits attached to a dispositive motion are not 'pleadings' within the meaning of Fed. R. Civ. P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f).")

---

[9] Plaintiffs appear to concede this fact in their reply brief, though they persist in arguing that the Rule 12(b)(6) motion can be struck. (*See* Doc. No. 16 at 1, Page ID # 382.)

Moreover, it is well settled that federal courts may consider matters that are of public record or otherwise appropriate for taking judicial notice without converting a Rule 12(b)(6) motion to a Rule 56 motion. *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *see Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds*, *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 n.2 (2002). Court rulings and sanctions awards are matters of public record, and matters of which a court may properly take judicial notice.[10] *Buck v. Thomas M. Cooley Law School*, 597 F.3d 812, 816 (6th Cir. 2010) ("Although typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6), a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment.") (citing *Winget v. JP Morgan Chase Bank, N.A*., 537 F.3d 565, 576 (6th Cir. 2008)).

Thus, and for all of the reasons set forth above, plaintiffs' motion to strike FirstEnergy defendants' motion to dismiss is DENIED. However, the Court finds it unnecessary to consider whether plaintiffs have been sanctioned in other courts in order to resolve the pending dispositive motion. The question of sanctions is not before this Court. FirstEnergy defendants' motion merely requests that the Court evaluate the sufficiency of the complaint to determine whether it fails to state a cause of action under

---

[10] The Court takes judicial notice of the fact that the state appellate court did find that Ohio Edison owed no duty to Lisa Huff under traditional tort law. *See Huff*, 130 Ohio St. 3d at 199 (citing *Huff v. FirstEnergy Corp.*, 2009-T-0080, 2010 WL 1253754 (Ohio Ct. App. 11th Dist. Mar. 31, 2010)). Instead, the state appellate court relied on the third-party tree maintenance contract to find the duty owed to Lisa Huff.

any of the pleaded statutes. Therefore, the Court shall confine itself to the analysis laid out in Rule 12(b)(6).

B.  *Plaintiffs' Motion to Take Judicial Notice*

While plaintiffs complain that FirstEnergy defendants have relied upon matters outside of the four corners of the complaint in moving for dismissal under Rule 12(b)(6), plaintiff Reggie Huff, himself, moves the Court to take judicial notice of matters outside the pleadings. In a motion filed May 13, 2013, Reggie Huff invites the Court to take judicial notice of recently publicized remarks made by former Michigan Supreme Court Justice Elisabeth Weaver (Doc. No. 23).[11] These remarks, which were made in connection with a book written by the former Michigan justice, purportedly criticize some of her fellow jurists for allegedly engaging in various questionable conduct. (*See* Doc. No. 23-2, News Article.) Plaintiff Reggie Huff also requests that the Court take judicial notice of "the entire book" written by Weaver. (Doc. No. 23 at 2, Page ID # 417.) He suggests that this evidence demonstrates "the conduct complained of [in plaintiffs' complaint] is in fact <u>not</u> an extreme rarity in modern times and/or in similar situations[,]" and renders FirstEnergy defendants' implausibility defense "frivolous." (*Id.* at 1-2, Page ID # 416-17.)

FirstEnergy defendants oppose the motion, arguing both that the remarks and the book fail to meet the federal evidentiary criteria for judicial notice, and that the evidence is irrelevant to the question of the plausibility of plaintiffs' claims. Rule 201(b) of the Federal Rules of Evidence provides that: "[t]he court may judicially notice a fact

---

[11] This motion is fully briefed. (*See* FirstEnergy defendants' opposition brief at Doc. No. 24, and plaintiff Reggie Huff's reply at Doc. No. 25.)

that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court agrees that former Justice Weaver's attacks upon her former colleagues are neither generally known within this Court's jurisdiction, nor can the veracity of these matters be accurately and readily determined from well-accepted sources. As such, the motion to take judicial notice is DENIED.

Additionally, the Court finds it necessary to comment on the difference between possibility and plausibility. Federal Civil Rules of Procedure 8 and 9(b) require more than the theoretical possibility that public corruption may exist. Rather, such legal conclusions "must be supported by factual allegations" that give rise to an inference that the defendant is, in fact, liable for the misconduct alleged. *Iqbal*, 556 U.S. at 679. The factual allegations must show more than a possibility that the defendant acted unlawfully. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557). The fact that plaintiffs perceive a general culture of corruption in our society, and can point to unrelated instances in the news and in other settings, brings them no closer to stating a cause of action for fraud against the defendants in this case. With that, the Court now turns to plaintiffs' complaint, and the allegations against FirstEnergy defendants.

C.       *Rooker-Feldman Doctrine*

FirstEnergy defendants contend that plaintiffs' claims should be dismissed for lack of subject matter jurisdiction because they are barred by the *Rooker-Feldman* doctrine. Specifically, they argue that plaintiffs are impermissibly attempting to collaterally attack the Ohio Supreme Court's decision, on reconsideration, to overturn the state appellate court's decision remanding the personal injury action back to the trial court. According to FirstEnergy defendants, this Court cannot rule in plaintiffs' favor "without reviewing and potentially rejecting the merits of the state-court decision." (Doc. No. 7-1 at 7, Page ID # 158.)

Plaintiffs insist that they are not attempting to re-litigate any claims raised in state court. While they maintain that the "final legal conclusion in state court is wrong," they represent that they are seeking redress for the deprivation of the right to engage in state court in an environment free of the taint of judicial corruption. (Doc. No. 12 at 10, Page ID # 273.) As such, they maintain that their complaint puts the *Rooker-Feldman* doctrine "out of sight." (*Id.*)

The *Rooker-Feldman* doctrine arose from two Supreme Court decisions interpreting 28 U.S.C. § 1257(a), a statute which is "designed to prohibit end-runs around state court judgments that might occur when parties go into federal court essentially seeking a review of a state-court decision."[12] *Kovacic v. Cuy. County Dep't of Children and Family Servs.*, 606 F.3d 301, 308 (6th Cir. 2010). Because § 1257(a) limits review of

---

[12] *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust. Co.*, 263 U.S. 413 (1923).

final judgments or decrees by the highest court of the State to certiorari review by the United States Supreme Court, the *Rooker-Feldman* doctrine, by negative inference, precludes such review by lower federal courts. *Id*. at 308-09.

Application of the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and judgment of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp*., 544 U.S. 280, 284, 125 S. Ct. 1517, 161 L. Ed. 2d 871 (2005) ("[t]he *Rooker-Feldman* doctrine merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to this court, *see* § 1257(a)"). However, when a "federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" *Exxon*, 544 U.S. at 293 (citation and quotation omitted). *See Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008) ("In the wake of *Exxon*, this circuit has 'distinguished between plaintiffs who bring an impermissible attack on a state court judgment—situations in which *Rooker-Feldman* applies—and plaintiffs who assert independent claims before the district court—situations in which *Rooker-Feldman* does not apply.'") (quoting *Pittman v. Cuyahoga County Dep't of Children and Family Servs*., 241 F. App'x 285, 287 (6th Cir. 2007) (further citation omitted)).

16

Thus, following the decision in *Exxon*, the pertinent inquiry is to determine the "source of the injury" that is addressed by a plaintiff's federal cause of action. *See Kovacic*, 606 F.3d at 309 (applying the "source of the injury" inquiry and rejecting the previously embraced "inextricably intertwined" standard); *Lawrence*, 531 F.3d at 368-69 (same); *McCormick v. Braverman*, 451 F.3d 382, 394-95 (6th Cir. 2006) (same). Under this inquiry, "[i]f the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *McCormick*, 451 F.3d at 393.

In the present case, FirstEnergy defendants contend that plaintiffs are seeking to "vindicate wrongs allegedly caused by the Ohio Supreme Court's decision in [the state court action]," and argue that "the Court cannot make that determination without reviewing and potentially rejecting the merits of the state-court decision." (Doc. No. 7-1 at 7, Page ID # 158.) In support of their position, defendants cite to various complaint allegations that suggest that the source of plaintiffs' injury is the state court ruling. (*See* Compl. ¶¶ 47(g), 63, 65, 75, 78, 81, 85.)

Plaintiffs counter, emphasizing that their claims:

> in this suit are completely independent of the personal injury claims of any state court case. Plaintiffs are resigned to the existence of the final judgment in Ohio Supreme Court Case No. 10-0857 and its legal affect [sic] that being the permanent destruction of their "property". Plaintiff's are not asking this Court to "review and reject" that judgment or to "set aside" the judgment as an appellate court might do. Plaintiff's cause therefore is not a "de facto appeal."

(Doc. No. 12 at 9, Page ID #272.) Consistent with this position, the complaint repeatedly provides that plaintiffs have been harmed by the deprivation of the "honest services" of

17

public officials "by and through the bribery of public officials, namely a super majority of the Ohio Supreme Court Justices." (Compl. ¶ 41; *see* Compl. ¶ 63 [harmed "by depriving Plaintiffs and the Citizens of Ohio of the honest services of (Nominal Defendants) Ohio Public Officials free of corruption and unlawful influence."]; Compl. ¶¶ 65, 75, 78, 81, 85 [same].)

Courts are far from uniform in their treatment of similar allegations. In *Karas v. Robbins*, Civ. A. No. 08-5264 (SRC), 2009 WL 2912778 (D. N.J. Sept. 9, 2009), a plaintiff filed a federal action alleging that her rights to a fair adjudication of her state landlord-tenant were violated by various state court judges, who allegedly accepted bribes and kickbacks in exchange for a ruling in favor of the plaintiff's tenants. The court found that the *Rooker-Feldman* doctrine barred the federal action because the federal action was "inextricably intertwined" with the prior state action, noting that a ruling by the district court in favor of plaintiff would "have the effect of overruling and/or vacating the orders and judgments rendered by the state court judges during the course of the state court action." 2009 WL 2912778, at *5. Similarly, in *Castiglione v. Papa*, 1:09-CV-0967 (LEK/DRH), 2010 WL 2044688 (N.D. N.Y. May 24, 2010), a plaintiff brought suit against state judges and private individuals alleging that defendants conspired to deprive her of her rights in probate to the proceeds of her father's estate. In imposing a *Rooker-Feldman* doctrine bar to the federal action, the district court reasoned that the federal claims were merely asserted as "a way of explaining the state court decisions" that plaintiff was requesting that the federal court review and reject. 2010 WL 2044688, at *7,

*aff'd*, 423 F. App'x 10 (2d Cir. 2011).[13] Nonetheless, in reaching this conclusion, the court stressed that the allegations of conspiracy and bribery were "wholly conclusory, completely unsupported by facts[.]" *Id.*

The Seventh Circuit reached a contrary result in *Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006). There, the plaintiff alleged that defendants, her former husband, judges, court reports and others involved in her divorce proceedings, conspired to defraud her by corrupting those state court proceedings. In reversing the district court's dismissal, the court reasoned that "[t]he claim that a defendant in a civil rights suit 'so far succeeded in corrupting the state judicial process as to obtain a favorable judgment' is not barred by the *Rooker-Feldman* doctrine." *Loubser*, 440 F.3d at 441 (citing *Nesses v. Shepherd*, 68 F.3d 1003, 1005 (7th Cir. 1995)). *See also Davit v. Davit*, 173 F. App'x 515, 517 (7th Cir. 2006) (reversing the district court's finding that *Rooker-Feldman* barred a civil RICO claim that defendants conspired to deprive plaintiff of a fair state court domestic relations proceeding, but affirming the district court's alternative ruling that the complaint failed to state a cause of action under Rule 12(b)(6)).

A district court in the Northern District of Alabama was faced with complaint allegations that contained the same general flavor as those presented in plaintiffs' complaint. *Blackburn v. Calhoun*, No. 207CV166, 2008 WL 850191 (N.D.

---

[13] The court found that "[w]hile Plaintiff seeks to frame her current action in terms of constitutional violations and various claims not before the state court, this Court cannot overlook the plain fact that her Amended Complaint consists of an array of reasons why her father's will should not have been admitted to probate. Plaintiff is essentially complaining that she suffered a lesser inheritance than she was rightfully due as a result of the state court's conclusion regarding the authenticity of the will and codicil. Insofar as she seeks a determination from this Court that the will and codicil were not authentic, but rather the result of forgery and fraud committed primarily by [certain defendants], Plaintiff is asking this court to review and reject the state court's decision to allow probate of the will." *Id.* at *21.

Ala. Mar. 4, 2008). There, the plaintiff alleged a civil RICO conspiracy that involved "corrupt judges" throwing cases in favor of attorneys who rewarded the judges with "in-kind" benefits.[14] *Id*. at *11. He further alleged that his state court domestic relations proceeding fell victim to this RICO scheme, which had the effect of depriving him of his right to the honest services of the judge that presided over his state court action. As predicate acts to support RICO, plaintiff cited bribery under Alabama law, extortion, money laundering, mail fraud and wire fraud. The court held that *Rooker-Feldman* did not bar the plaintiff's claims, underscoring the fact that the plaintiff was not challenging the state court domestic relations judgment against him, but merely pointed to them as "RICO byproducts." *Blackburn*, 2008 WL 850181, at *21.

Like the plaintiff in *Blackburn*, plaintiffs insist that the source of their injury is the deprivation of a state judicial process free of the taint of public corruption, and that the denial of Lisa Huff's personal injury claim is merely a "RICO proceed." (Doc. No. 12 at 9, Page ID # 272.) By alleging the deprivation of the honest services of the judicial defendants through bribery, the Court finds that plaintiffs have identified an injury separate and apart from the rulings issued in state court.[15] The fact that the complaint's primary focus is on the alleged erroneous nature of the state high court's resolution of the underlying personal injury case makes this an exceedingly close call. Nonetheless, the Court believes that the Sixth Circuit's practice of "tighten[ing] the

---

[14] The judges and the co-conspirator attorneys were all members of an exclusive hunting club. It was alleged that, as part of the conspiracy, the attorneys "paid" the judges for their favoritism by absorbing the club dues owed by the judges. *Id*. at *11.

[15] While the Court finds that this is a separate injury for purposes of *Rooker-Feldman* analysis, it also finds—as set forth *infra*—that the injury is not cognizable under civil RICO. Nonetheless, the Court finds it advantageous to treat issues of jurisdiction and cognizability separately.

scope" of the doctrine and its admonition that the source of the injury controls place the *Rooker-Feldman* doctrine "out of reach" in this case. *See, generally, Kovacic,* 606 F.3d at 309.

>       D.      *Federal and State RICO Claims*

FirstEnergy defendants next contend that plaintiffs' claims must be dismissed for failure to state a cause of action. Plaintiffs assert substantive federal RICO claims under 18 U.S.C. §§ 1962(b) and (c). Under § 1962(b), plaintiffs must plead facts tending to establish that FirstEnergy defendants "(1) acquired or maintained (2) through a pattern of racketeering activity or the collection of an unlawful debt (3) an interest in or control of an enterprise (4) engaged in, or the activities of which affect, interstate or foreign commerce." *Advocacy Org. for Patients & Providers Auto Club Ins. Ass'n*, 176 F.3d 315, 321-22 (6th Cir. 1999) (internal quotation and citation omitted). To state a civil RICO claim under § 1962(c), plaintiffs must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima. S.P.R.L. v. Imrex Co., Inc.*, 473 U.S 479, 496 (1985); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006).

>       1.      Racketeering Activity

"Racketeering activity" is defined in 18 U.S.C. § 1961(1) as any one of a numerous list of state and federal offenses that qualify as racketing activity. Plaintiffs assert that FirstEnergy defendants engaged in racketing activity by committing mail and wire fraud, in violation of 18 U.S.C. § 1341 and § 1343, and honest services mail and

wire fraud, in violation of § 1346. (Compl. ¶ 61.)[16] FirstEnergy defendants contend that plaintiffs have failed to adequately plead these predicate acts.

### a.      Honest Services Fraud

Plaintiffs allege that FirstEnergy defendants employed two mechanisms to deprive plaintiffs of their right to honest services of the judicial defendants:  a straw-man donor scheme and a bribery scheme. A claim of honest-services fraud must allege the fraudulent deprivation of honest services through a bribery or kickback scheme. *Skilling v. United States*, 130 S. Ct. 2896, 2931 (2010). Therefore, a straw-man donor scheme, whose aim was allegedly to circumvent campaign donation limitations, cannot support a claim of honest services fraud. *See United States v. Turner*, 465 F.3d 667, 669 (6th Cir. 2006) (use of "straw" donor scheme to avoid the personal campaign contribution limit constituted a scheme to deprive citizens of the right to honest elections and *not* the right to the honest services of elected officials) (emphasis added).

However,  a bribery scheme may support a claim for honest services fraud, *Skilling*, 130 S. Ct. at 2931, so long as a plaintiff pleads facts establishing sufficient grounds to infer "a *quid pro quo*"—that "the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take." *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012). Where, as here, the alleged bribe is a campaign contribution, the facts must show that the contribution was given "in return for a specific official action . . . No generalized expectation of some

---

[16] While the complaint only identifies as predicate acts mail fraud and wire fraud, considering the complaint as a whole, and applying a liberal interpretation appropriate for *pro se* complaints, the Court finds that the complaint also pleaded honest services mail and wire fraud as predicate acts.

future action will do." *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011); *see United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions. No bribe thus occurs if the elected official later does something that benefits the donor. On the other hand, if the donor . . . makes a contribution so that an elected official will 'do what I ask him to do,' and the official . . . accepts the payment with the same understanding, the donor and the official have formed a corrupt bargain.") (internal record citation omitted).

Here, plaintiffs allege the existence of a *quid pro quo* agreement whereby the judicial defendants agreed to take "unique, special, specific AND improper official acts needed to prevail in a major civil suit [the Huff personal injury suit][,]" in exchange for a $150,000 bribe. (Compl. ¶ 13.)  Such an agreement, properly supported by factual allegations, would seem to satisfy the *quid pro quo* necessary to mark the "difference between a run-of-the-mine contribution and a bribe." *Terry*, 707 F.3d at 613.

Nonetheless, the only facts offered in support of this conclusory allegation include the existence of campaign contributions, the reversal, on reconsideration, by the Ohio Supreme Court, the fact that this ruling benefited FirstEnergy defendants, plaintiffs' belief that such a ruling was "unprecedented"[17] and legally erroneous,[18] and that

---

[17] FirstEnergy defendants properly observe that the Ohio Supreme Court often considers matters on reconsideration; a fact to which this Court may take judicial notice (*See* Doc. No. 7-1 at 157 [collecting examples of 20 cases in which the Ohio Supreme Court granted motions for reconsideration in the last year, alone].)

[18] Plaintiffs point to a number of extraneous rulings and events that they believe support a finding that reversal on reconsideration was legally erroneous. For example, plaintiffs note that, in another case, the Ohio Supreme Court is alleged to have made the reasonable representation that, upon *de novo* review, it does not defer to the trial court on issues of law. (Compl. ¶ 47(g)). Of course, the mere fact that the Ohio Supreme Court's *de novo* review led to a result consistent with that originally taken by the trial court does not establish an abdication of judicial responsibility, let alone collusion.

plaintiffs' counsel was "literally stunned" by the Ohio Supreme Court's ruling.[19] (Compl. ¶ 47.) Close-in-time contributions, standing alone, will not suffice to establish a *quid pro quo* agreement. *Siegelman*, 640 F.3d at 1171. Moreover, the fact that plaintiffs and their counsel disagree with the ruling is insufficient to establish that it was the unlawful result of bribery. *See Dennis v. Sparks*, 449 U.S. 24, 28 (1980); *Castiglione*, 2010 WL 2044688, at \*10 (that the ruling in state court favored the defendants, and therefore is consistent with a bribery scheme "falls far short of stating a plausible claim"). If such were the case, every dissatisfied state court litigant could maintain a bribery action in federal court.

Plaintiffs attempt to fill in the gaps with additional conclusory allegations that the reversal "smacks of a payoff[,]" that plaintiffs are "forced to suspect" that "an unlawful ***ex parte*** influence was involved" in the ruling, and that FirstEnergy defendants "were unable to resist the exigent need to utilize their bought and paid for political influence to gain access to the [judicial defendants], ***ex parte***, and communicate explicitly and/or implicitly the unacceptable nature of their failure to perform their end of the ***quid pro quo***."[20] (Compl. ¶¶ 10, 46.) On a Rule 12(b)(6) motion, however, these conclusory allegations must be disregarded. *Iqbal*, 556 U.S. at 678.

In opposition to the motion to dismiss, plaintiffs also point to unrelated criminal public corruption trials over which this Court has presided in the past, their

---

[19]Additionally, plaintiffs reference "willfully materially false representations to the Supreme Court of Ohio" by certain non-party individuals, but fail to specify with particularity the nature of the statements. (Compl. ¶ 47(f)).

[20] The only *ex parte* communications plaintiffs allude to in their complaint involve an alleged text message exchange between their former counsel and non-party former justice Yvette McGee Brown, in which Brown allegedly indicated that she believed that one of her fellow justices was rude during oral argument, and Attorney Betras's comment that it was his belief that Brown was the most attractive justice on the court. (Compl. ¶¶ 50-51.) While this exchange may suggest possible inappropriate conduct on the part of plaintiffs' former counsel, it does not support allegations of a *quid pro quo* bribery scheme.

suspicions as to why the Ohio Supreme Court voted unanimously to reverse the court of appeals when only five justices voted to reconsider the appeal, and a 2003 law review article that plaintiffs believe demonstrates that courts engage in "docket clearing" techniques. (Doc. No. 12 at 2-14, Page ID # 265-277.) The existence of evidence of unrelated public and judicial corruption, however, cannot support a complaint against FirstEnergy defendants. Likewise plaintiffs' views on the justice system do not excuse the pleading requirements in federal court.

At its core, plaintiffs' allegations of honest services fraud comprise nothing more than innocuous facts mixed with conclusory allegations. The complaint is wholly lacking in any factual support for plaintiffs' suspicions of fraud. *See Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) ("Even under Rule 12(b)(6), a complaint containing a statement of facts that merely creates a *suspicion* of a legally cognizable right of action is insufficient.") To allow this case to go forward on these allegations would unnecessarily expose defendants' reputations to unsubstantiated allegations of wrongdoing and amount to condoning a "fishing expedition in order to find a cause of action." *Hollowell v. Cincinnati Ventilating Co.*, 711 F. Supp. 2d 751, 769 (E.D. Ky. 2010) (quoting *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 204 (3d Cir. 2006)); *see Chesbrough*, 655 F.3d at 466. Thus, the Court concludes that the complaint fails to satisfy the general pleading requirements of Rule 8, and the more demanding pleading requirements of Rule 9(b) to establish the predicate acts of honest services fraud.

**Traditional Mail and Wire Fraud**

Plaintiffs also attempt to establish the existence of traditional mail and

wire fraud as predicate acts for their RICO claims. Mail fraud consists of "(1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). "The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud." *Heinrich,* 668 F.3d at 404 (citation omitted).

For purposes of mail and wire fraud, the scheme to defraud must include an intent to "deprive another . . . of money or property[.]" *See United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012). According to the complaint, FirstEnergy defendants intended to deprive plaintiffs of Lisa Huff's personal injury claim. (Compl. ¶ 63.) FirstEnergy defendants argue that, "[e]ven if a civil claim could be money or property for purposes of §§ 134 and 1343," plaintiffs have failed to allege facts that would plausibly suggest that the property was lost due to alleged fraud. (Doc. No. 7-1 at 12, Page ID # 163.) Plaintiffs offer the same conclusory allegations relating to the *quid pro quo* bribery scheme that failed to plausibly support a claim for honest service fraud to support their traditional mail and wire fraud claims, which the Court has already determined fall far short of satisfying Rule 8 and Rule 9(b).

Additionally, plaintiffs' allegations regarding the straw-donor scheme fail to state a claim for traditional mail or wire fraud because, "[i]n the context of election fraud [through a straw-donor scheme], the government and citizens have not been deprived of any money or property," but "have simply lost the intangible right to elect the official . . . ." *Turner,* 465 F.3d at 680. Indeed, plaintiffs do not even allege that the straw-donor scheme was "intend[ed] to deprive" them—or someone else—"of money or property." *Cunningham*, 679 F.3d at 370 (internal quotation marks omitted). To the

26

contrary, they assert that the intent was "to thwart the . . . contribution limits" (Compl. ¶ 38) and "to influence the judicial candidates[.]" (*Id*. ¶ 39(I)).Thus, the complaint fails to state a claim for mail or wire fraud.[21]

## 2. *Pattern of Racketeering Activity*

To establish a "pattern of racketeering activity," a plaintiff must allege "at least two predicate acts of racketeering activity occurring within a ten-year period[,]" *Moon*, 465 F.3d at 723, and "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tele. Co*., 492 U.S. 229, 239 (1989) (emphasis in original). "Continued activity" may be plead by demonstrating "a series of related predicates extending over a substantial period of time" ("closed continuity"), or "past conduct that by its nature projects into the future with a threat of repetition" ("open-ended continuity"). *Moon*, 465 F.3d at 724 (internal quotation and citation omitted).

With respect to closed continuity, "racketeering activity lasting only 'a few weeks or months and threatening no future criminal conduct' is insufficient." *Moon*, 465 F.3d at 726 (quoting *H.J. Inc*., 492 U.S. at 242). FirstEnergy defendants argue that, even if plaintiffs had established the existence of two predicate acts, they have alleged "[n]o other schemes, purposes, or injuries" beyond those related to the underlying state personal injury case. (Doc. No. 7-1 at 165 [quoting *Moon*, 465 F.3d at 725].)

In *Venmco, Inc. v. Camardella*, 23 F.3d 129, 134-35 (6th Cir.), *cert.*

---

[21] The Court observes that the complaint fails to plead with any particularity the dates on which the mails or wires were utilized and by whom. (*See* Compl. at ¶ 42 [alleging simply "extensive use of the mails and wires"].) The Court could, in its discretion, permit plaintiffs to amend to "flesh out" the particularities of these incidents. Nevertheless, for reasons to be discussed shortly, plaintiffs have more fundamental problems with the allegations in the complaint that cannot be cured by amendment.

*denied*, 513 U.S. 1017 (1994), the Sixth Circuit held that a single scheme to defraud, growing out of a contract dispute, did not have the necessary continuity to support a finding of a pattern of racketeering activity. While the court noted that the existence of a single fraudulent scheme did not "automatically preclude the finding of a pattern," the court found that the single fraudulent scheme spanning 17 months was insufficient to support a RICO claim. *Id.* at 134-35; *see Polzin v. Barna and Co.*, No. 3:07-CV-127, 2007 WL 2710705, at *8 (E.D. Tenn. Sept. 14, 2007) (single fraudulent scheme involving contract dispute did not support close-ended continuity).

While the complaint alleges, in conclusory fashion, that the personal injury lawsuit "was not the only future legal issue" that FirstEnergy defendants were hoping to influence, no other litigation is identified, and the remainder of the complaint focuses exclusively on the now completed state court personal injury action. (Compl. ¶¶ 37, 41, 43-47.) This one alleged fraudulent scheme, which affording a liberal construction to plaintiffs' complaint lasted 14 months and had as its sole objective "to have the Ohio Supreme Court destroy the suit no matter what path it took in getting to that Court[,]" *see* Compl. ¶ 37, is insufficient to show "long term criminal conduct." *See H.J. Inc.*, 492 U.S. at 242; *see, e.g., Moon*, 465 F.3d at 726 (single scheme to terminate the plaintiff's own worker's compensation benefits did not establish close-ended continuity).

Likewise, the Court finds that plaintiffs have insufficiently plead factual allegations that would support a finding of open-ended continuity. "While closed-end continuity looks at a substantial but finite period of time over which the alleged predicate acts took place, open-ended continuity contemplates short-term racketeering activity that could continue into the future." *HMV Properties, LLC v. IDC Ohio Mgt., LLC*, No. 2:08-

28

cv-895, 2011 WL 53166, at *9 (S.D. Ohio Jan. 6, 2011) (citing *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991)).  Here, plaintiffs have alleged a terminable scheme that played out to its conclusion with the Ohio Supreme Court's adverse ruling in 2011. Because plaintiffs have failed to allege any facts indicating that the scheme (either through bribery or "straw-donor" contributions) would continue into the future, they cannot establish open-ended continuity. *See, e.g., Intergo, LLC v. Switzerland & AM. Trust, LLC*, No. 3:10CV2519, 2012 WL 671415, at *3 (N.D. Ohio Feb. 29, 2012).  Thus, the Court finds that the complaint fails to set forth allegations to support a pattern of racketeering activity.

### 3. Existence of an Enterprise

The RICO statute defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). The enterprise must be separate from the "'person . . . participating in an enterprise's affairs,'" and thus "a corporation cannot be named as the liable 'person' and simultaneously fulfill the 'enterprise' requirement as well." *Puckett v. Tenn. Eastman Co*., 889 F.2d 1481, 1489 (6th Cir. 1989).

The complaint alleges that each of FirstEnergy, Ohio Edison, and FirstEnergy PAC is "an enterprise within the meaning of" 18 U.S.C. § 1961(4). (Compl. ¶¶ 56-58, 67-69.) Because these same entities are also defendants in this action and allegedly engaged in the harm the complaint attempts to address, the complaint fails to establish "distinct entities that represent the 'person' and the 'enterprise[.]'" *Puckett*, 889 F.2d at 1489, and, consequently, the claim fails on this basis, as well.

29

4.      *Standing to Bring RICO*

FirstEnergy defendants insist that plaintiffs lack standing to bring a civil RICO claim under federal law because they have not alleged a cognizable injury relating to their business or property. A plaintiff claiming civil RICO violations "only has standing if . . . he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496; *see* 18 U.S.C. § 1964(c) (limiting recovery to those who have been "injured in [their] business or property by reason of" racketeering). While plaintiffs assert, in conclusory fashion, that they have been "injured in their business and/or property," the only interest they allege has been damaged is the interest in the personal injury action and underlying personal injuries, themselves. FirstEnergy defendants argue these alleged injuries cannot bestow standing under the RICO statute.

"Whether a person has a 'property' interest is traditionally a question of state law." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (citing *Logan v. Zimmerman Brush Co*., 455 U.S. 422, 430 (1982)). For that reason, "'[i]njury to property' for RICO purposes is generally determined by state law." *Isaak v. Trumbull Sav. & Loan Co*.,117 Ohio St. 3d 192, 223 (6th Cir. 1999) (internal citation omitted). The Ohio Supreme Court has generally rejected the notion that an unliquidated personal injury claim is a property interest. *See Groch v. Gen'l Motors Corp*., 117 Ohio St. 3d 192, 222-23 (Ohio 2008).[22] Courts in other jurisdictions agree and have concluded that the "loss of an opportunity to pursue an unliquidated tort claim is not an injury to business or

---

[22] In *Groch*, the court found that a claim that could not accrue because of the passing of the ten-year repose period was not an existing, identifiable property interest, whereas a settlement in a tort action was. *Id*. at 223.

property" as required to establish RICO standing. *Wais v. Mackay*, No. 09-1103, 2009 WL 4884204, at *11 (E.D. Pa. Dec. 15, 2009) (further citation omitted); *Circiello v. Alfano*, 612 F. Supp. 2d 111, 115 (D. Ma. 2009) (collecting cases and noting that, "[t]he few courts to have addressed the issue have uniformily concluded that damages from an unliquidated personal injury lawsuit are not 'property' within the meaning of the RICO statute").

Likewise, recovery for personal injuries "is not allowed under civil RICO because it is not an injury to business or property." *Brown v. Cassens Transp. Co.*, 675 F.3d 946, 959 (6th Cir. 2012); *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798, 816 (W.D. Ky. 2000) (personal injuries and mental suffering were not property interests under RICO). Moreover, "pecuniary losses proximately resulting from a personal injury caused by a RICO violation . . . are also not recoverable[.]" *Brown*, 675 F.3d at 959. As such, neither plaintiffs' "economic hardship," nor their assertion of "lost opportunity" are compensable because both are "nothing more than pecuniary losses flowing from . . . a personal injury."[23] *Evans v. City of Chicago*, 434 F.3d 916, 931 (7th Cir. 2006).

### 5. *Ohio Substantive RICO*

Plaintiffs also bring a substantive RICO claim under Ohio law. Ohio's statute "is patterned after the federal RICO Act[,]" and therefore, "analysis of the [Ohio statute] is analogous to that of the federal RICO statute." *Powell v. Wal-Mart Stores, Inc.*,

---

[23] Additionally, plaintiffs cannot establish standing based on alleged deprivation of "honest services," inasmuch as this is not considered an injury to property for purposes of civil RICO. *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 941 n.14 (9th Cir. 2009); *Hollander v. Flash Dancers Topless Club*, 173 F. App'x 15, 17-19 (2d Cir. 2006); *see also Turner*, 465 F.3d at 680 ("In the context of election fraud, the government and citizens have not been deprived of any money or property because the relevant salary would be paid regardless of the fraud.")

No. 1:06CV00603, 2007 WL 987321, at *2 (N.D. Ohio Mar. 30, 2007), *aff'd*, 303 F. App'x 284 (2008). Plaintiffs incorporate the same factual allegations offered in support of their federal RICO claims into their state RICO claim under Ohio Rev. Code § 2923.32 (Compl. ¶ 66), and offer conclusory allegations to support the same bribery and straw-donor contribution schemes that they attempt to use to support their federal RICO claims. (Compl. ¶ 74.) Thus, plaintiffs' Ohio RICO claim is subject to dismissal for the same reasons that their federal claims fail to state a cause of action.

6.      *RICO Conspiracy*

FirstEnergy defendants also maintain plaintiffs have failed to allege a RICO conspiracy under federal and Ohio law. "To plausibly state a claim for a violation of 18 U.S.C. § 1962(d), plaintiffs "must successfully allege all the elements of a RICO violation, as well as alleg[e] 'the existence of an illicit agreement to violate the substantive RICO provisions.'"[24] *Heinrich*, 668 F.3d at 393 (quoting *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983)).

The only allegation connecting FirstEnergy defendants to the judicial defendants provides that these parties "formed an agreement to accept past, present and future cash payments as a **$150,000** + **bribe** and a payoff for . . . improper acts." (Compl. ¶ 13.) This conclusory allegation fails to allege "when, where, or between whom any alleged illicit agreement was made." *See Mierzwa v. Safe & Secure Self Storage, LLC*, 493 F. App'x 273, 276 (3d Cir. 2012) ("[C]onclusory allegations that defendants

---

[24] Ohio Rev. Code § 2923.34(B) authorizes a civil action for conspiracy to violate the Ohio RICO provisions. While the Ohio statute is broader than the federal RICO conspiracy statute, *see State v. Siferd*, 151 Ohio App. 3d 103, 119 (Ohio Ct. App. 3d Dist. 2002), it, like its federal counterpart, requires proof that the conspiracy was designed to engage in racketeering activity. *See Nat'l Cent. Fin. Enters., Inc. v. J.P. Morgan Chase Bank*, 604 F. Supp. 2d 1128, 1157 (S.D. Ohio 2009).

conspired for the purpose of defrauding him are simply inadequate to plead a valid [RICO conspiracy] claim."). Moreover, the complaint fails to allege that any of the individual FirstEnergy defendants (Vespoli, Alexander and Pearson) ever interacted in any way with the judicial defendants to create an understanding that favorable rulings were a condition of campaign contributions.[25] *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178-79 (3d Cir. 2010), *cert denied*, 131 S. Ct. 1798 (2011). Thus, even if plaintiffs had sufficiently plead the elements of substantive RICO, the failure to adequately allege a RICO conspiracy would doom this claim. Ultimately, the Court must conclude that plaintiffs have failed, as a matter of law, to state claims under federal and Ohio law for racketeering and conspiracy.

> E.       *Section 1983 Claim*

In Claim Six of the complaint, plaintiffs allege due process claims under 42 U.S.C. § 1983 against defendants Vespoli, Alexander and Pearson. (Doc. 1 at 41-42). Specifically, plaintiffs claim as follows:

> The conduct of Defendants **VESPOLI, ALEXANDER & PEARSON** involving **corruption of the legal process, collusion, destruction of discoverable evidence** and **Bribery of Ohio Judicial Officials** all support Plaintiffs charge of repeated willful violation or derogation of their 5th + 14th Amendment right to due process and the right to possess and protect the full value of their property. Said derogation involving complete obstruction of the fundamental right to appear and litigate civil claims and the right to defend and protect one's person, property and livelihood by way of court petition for relief.

> All of the material conduct of Defendants **VESPOLI,**

---

[25] Conclusory allegations that Vespoli and Alexander, at some unspecified point in time, "devised a scheme" to bribe the judicial defendants through the use of bribes and straw-donor contributions are insufficient to tie the defendants to the same conspiracy. *See Twombly*, 550 U.S. at 556 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.")

> **ALEXANDER & PEARSON** detailed in part herein, both individually and in collusion, resulting in direct and indirect control of the courts wherein the authority of the courts was converted to the personal control and use of the Defendants **VESPOLI, ALEXANDER & PEARSON**. Said conduct making Defendants **VESPOLI, ALEXANDER & PEARSON** actual and/or *de facto* **state actors** by controlling both sides of litigation eliminating and/or seizing the power of the state to insure due process and dispense justice.

(Compl. ¶¶ 83-84.)

To set forth a cognizable § 1983 claim, a plaintiff must establish that (1) he was deprived of a right secured by the Constitution or the laws of the United States, and (2) the deprivation was caused by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). Here, defendants Vespoli, Alexander and Pearson are private parties.

In general, a plaintiff cannot assert a claim under §1983 against a private party based on private conduct "no matter how discriminatory or wrongful" the party's conduct may have been. *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003). However, "[i]f a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be liable pursuant to § 1983 . . . ." *Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000).

The Supreme Court has specifically ruled that where a plaintiff alleges "that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge . . . private parties conspiring with the judge were acting under color of state law." *Dennis*, 449 U.S. at 28. Yet, the Supreme Court has cautioned that "merely resorting to the courts and being on the winning side of a judgment does not

34

make a party a co-conspirator or a joint actor with the judge." *Id.*

Thus, in the wake of the Supreme Court's ruling in *Iqbal*, district courts afford no assumption of truth to a plaintiff's bare allegations that a judicial decision is the result of private parties conspiring with the judges to deprive a plaintiff of his constitutional rights. *See, generally, Iqbal*, 556 U.S. at 678. While plaintiffs argue that they need not demonstrate an illegal *quid pro quo* agreement made with "express terms," they still must come forward with factual allegations that take their claim from possible to plausible. "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57; *see Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987) ("It is well settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material fact will not be sufficient to state a claim under § 1983.") Plaintiffs rely on the same speculative allegations of collusion and conspiracy to support their § 1983 action that they offered in support of their RICO claims. (Compl. ¶ 82.) Plaintiffs allege no facts that, if viewed in the light most favorable to plaintiffs, would support a finding that FirstEnergy defendants entered into a conspiracy with the judicial defendants to deprive plaintiffs of their civil rights through bribery. Plaintiffs' § 1983 claim is also subject to dismissal.

F.     *Motion to Amend*

Plaintiffs seek leave to amend their complaint to allege "potentially material events that have occurred since the original file date of this cause and to add

material information regarding tangible damages to Plaintiff's property, an implicit *quid pro quo* and to correct a few minor clerical errors, etc." (Doc. No. 11 at 1, Page ID # 250.) FirstEnergy defendants oppose any effort to amend on futility grounds (Doc. No. 13), and plaintiffs have filed a reply (Doc. No. 17).[26] "[G]enerally, '[i]f it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief, the court should dismiss with leave to amend.'" *Brown v. Matauszak*, 415 F. App'x 608, 614 (6th Cir. 2011) (quoting 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1483 (3d ed. 2010)). Dismissal with leave to amend is particularly preferable "'where deficiencies in a complaint are attributable to oversights likely the result of an untutored pro se litigant's ignorance of special pleading requirements[.]'"[27] *Brown*, 415 F. App'x at 614-15 (quoting *Reynoldson v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990)). Nevertheless, it remains the case that "leave to amend should be denied if the amendment . . . would be futile." *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011) (internal quotation omitted); *Perkins v. Am. Elec. Power Fuel Supply, Inc*., 246 F.3d 593, 605 (6th Cir. 2001). "Amendment of a complaint is futile when the proposed amendment would not permit the complaint to survive a motion to dismiss." *Miller v. Calhoun Cnty*.,

---

[26] In their brief in opposition to FirstEnergy defendants' motion to dismiss, plaintiffs also indicate that, "[i]f Plaintiffs are allowed to amend and supplement, the elements of an unlawful *quid pro quo* and bribery affected by this stunning information will be pled in allowing Defendants a full opportunity to defend against their own argument that just backfired." (Doc. No. 12 at 9, Page ID # 272.)

[27] The Court acknowledges that an exception to the particularity requirement of Rule 9(b) exists where the relevant facts "lie exclusively within the knowledge and control of the opposing party . . . ." *Craighead v. E.F. Hutton & Co., Inc*., 899 F.2d 485, 489 (6th Cir. 1990) (citation omitted). In such a case, it would be inappropriate to dismiss an action pursuant to Rule 9(b) when the facts underlying the claims are within the defendant's control, especially when no discovery has been conducted. *See Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988). However, plaintiffs have failed to allege that FirstEnergy defendants are in control of any records that arguably could provide the factual allegations needed to rescue their claims from dismissal.

408 F.3d 803, 817 (6th Cir. 2005).

Although this Court construes plaintiffs' *pro se* motion liberally, it finds that it would be futile for plaintiffs to amend to add the factual allegations and legal arguments detailed in their motion to amend. Plaintiffs wish to amend the complaint to add five categories of allegations. First, they seek to amend to allege that former Ohio Supreme Court Justice Yvette McGee Brown was recently made a partner at Jones Day, the law firm defending the present action on behalf of FirstEnergy defendants. Plaintiffs argue that former Justice McGee Brown is "heavily involved in this case[,]" and the fact that she "effectively works for the Defendants and their counsel she is no longer free to testify to anything that could in the slightest way affect the Defendant[']s defense of this case."[28] (Doc. No. 17 at 2, Page ID # 386.) Plaintiffs suggest that Justice McGee Brown's association with Jones Day would result in the firm "attempt[ing] to obstruct access to a key witness[,]" and claim that this appointment is "no insignificant event especially in the context of recent public comments Justice McGee Brown has made concerning the [judicial defendants] to this suit." (Doc. No. 11 at 1, Page ID # 250.)

While the Court does not share plaintiffs' concerns that this appointment would compromise Justice McGee Brown's ability to participate (should she be called) as a witness in this case, the more pressing problem for plaintiffs is that they fail to demonstrate how this fact could be used to support and bolster their otherwise deficient claims. There are no allegations that Justice McGee Brown was a party to the alleged

---

[28] Plaintiffs further offer, gratuitously and in conclusory fashion, that "[a] Federal Judge is not so naïve as to not know what is going on here and maybe that is the point. Spread the misconduct out so broadly that it becomes too big to fail and too scary even for a Federal Judge to be able to control and allow justice to prevail. Which is exactly why the Defendants must not be allowed to benefit in anyway from this extraordinary misconduct and should properly pay a heavy price for it." (Doc. No. 17 at 2, Page ID # 386.)

conspiracy (only that plaintiffs' own counsel exchanged unrelated text messages with her regarding the alleged rudeness of another justice and Ms. McGee Brown's personal appearance), nor would her recent employment decision in any way cure any of the complaint deficiencies outlined above.

Second, plaintiffs seek to amend to add the details relating to the fees and expenses they have incurred in prosecuting the underlying state personal injury action. Apparently responding to FirstEnergy defendants' argument relating to standing, plaintiffs assert that "an actual cash investment establishes an irrefutable tangible interest in the subject property[.]" (Doc. No. 11 at 1, Page ID # 250.) As previously discussed, the unliquidated personal injury action, and any damages or costs associated with pursing that claim, are not comnpensable. *See* Section III, D. 4, *infra.*; *Brown*, 675 F.3d at 959 ("Any pecuniary losses proximately resulting from a personal injury caused by a RICO violation, e.g., attorney fees, lost wages, and medical expenses, are also not recoverable because they, too, do not implicate harm to any legal entitlement."); *Evans*, 434 F.3d at 926 (same).

Third, plaintiffs wish to add unidentified facts and legal argument relating to their research of the cases FirstEnergy defendants cited showing that the Ohio Supreme Court regularly permits reconsideration of discretionary appeals. According to plaintiffs, their research will show that reconsideration always favored "large corporate donors." (Doc. No. 11 at 2, page ID # 251.) However, even if the facts do support a finding that large corporate donors benefit from reconsideration, these facts would not take plaintiffs' allegations of fraud and conspiracy against FirstEnergy defendants from possible to plausible. Moreover, it would be neither appropriate nor helpful to permit

plaintiffs to amend the complaint to add legal argument regarding the relevance of the cases cited by FirstEnergy defendants in their motion to dismiss.

Fourth, plaintiffs identify a March 16, 2009 blog (attached to the motion to amend as Doc. No. 11-1), which purports to be a news article prepared by an unknown individual discussing various encounters with Ohio Edison, and the author's views on the matters. One of the encounters discussed in the article involved Lisa Huff and the underlying personal injury action. The blog makes reference to an alleged taped conversation between Reggie Huff and an Ohio Edison employee. Plaintiffs suggest that this article places FirstEnergy defendants "in a poor light" and provides "motive" as to why Ohio Edison would not have wanted to risk a "publicized trial." (Doc. No. 11 at 2-3, Page ID # 251-52.) Plaintiffs fail to demonstrate how any of the alleged facts set forth in this blog could be used to cure the deficiencies in the complaint. While plaintiffs suggest that the article shows that Ohio Edison is "indifferen[t] to the health and safety of the public" (*Id.*), this fact does not establish that FirstEnergy defendants engaged in the wrongdoing alleged in the complaint. Moreover, the fact that Ohio Edison arguably received negative press in its dealings with the public does not bridge the gap between possible and plausible.

Fifth and finally, plaintiffs request leave to amend to include "some potentially material information about the Defendants' efforts to buy influence of the Ohio Supreme Court at the exact time the Court was to rule on discretionary jurisdiction in the Plaintiff's personal injury suit." (Doc. No. 11 at 3, Page ID # 252.) Plaintiffs maintain that campaign finance reports, filed September 3, 2010, reveal that employees of FirstEnergy made campaign contributions to Chief Justice O'Conner and Justice

Lanzinger immediately prior to the Ohio Supreme Court's ruling in the personal injury action. Plaintiffs fail to indicate why they were unable to incorporate these public records into their complaint prior to the filing of the present motion. More fundamentally, the existence of additional campaign contributions close-in-time to an official act is not enough to establish a *quid pro quo* agreement, and the Court is not required to accept plaintiffs' bare legal conclusions as what these contributions suggest. *Iqbal,* 556 U.S. at 678 (holding that a court is "not bound to accept as a true legal conclusion couched as a factual allegation[,]" and should disregard "mere conclusory statements").

Ultimately, the Court finds that it would be futile to permit plaintiffs to amend their complaint. The proposed factual allegations in their motion to amend mirror those that have been found to be insufficient under Rule 8 and Rule 9(b). Such an amendment would not survive a motion to dismiss because the factual allegations offered do not state any claims for relief which are plausible, and do not, otherwise, cure the numerous deficiencies in the complaint set forth above. Accordingly, plaintiffs' motion to amend is DENIED.

## IV.      CONCLUSION

For all of the foregoing reasons, FirstEnergy defendants' motion to dismiss is GRANTED. All claims in the complaint are hereby DISMISSED with prejudice.

**IT IS SO ORDERED.**

Dated: September 17, 2013

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

41